CERTIFIED COPY

A True Copy

Teste:

_Rosina Samson_

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

Nos. 11-3022, 12-1180 & 12-1656

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY VOLPENDESTO, MARK POLCHAN, and MICHAEL SARNO,

*Defendants-Appellants.*

————————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08-CR-115 — **Ronald A. Guzmán**, *Judge.*

————————————

ARGUED DECEMBER 11, 2013 — DECIDED MARCH 24, 2014

————————————

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury convicted Anthony Volpendesto, Mark Polchan, and Michael Sarno of numerous offenses—principally racketeering conspiracy, but also conducting an illegal gambling business, conspiracy to damage property by means of an explosive device, and conspiracy to

obstruct justice, among others. The appellants now challenge their convictions and sentences.

## I. Background

This case involves a criminal enterprise operating in and around Cicero, Illinois. Through a business called Amusements Inc., the enterprise distributed "video gambling devices" to local bars and restaurants. These machines, which allow customers to deposit money in return for virtual credits, are legal so long as they are used for amusement only. But the enterprise and the establishment owners permitted trusted customers to redeem their credits for cash. The devices were modified to track money coming in and being paid out, so that the establishment owners and the enterprise could each take a cut of the profits. Video gambling was a lucrative business, and the enterprise did not take kindly to prospective competitors. When a rival company, C & S Amusements, encroached on Amusements Inc.'s turf, the enterprise placed a pipe bomb outside the rival's headquarters in order to send a message.

In addition to its gambling activities, the enterprise committed over a dozen home and jewelry-store robberies in Illinois and nearby states. The enterprise fenced many of the stolen items through Goldberg Jewelers, a store owned by appellant Mark Polchan. Members of the enterprise also dealt in other stolen goods, such as cigarettes and electronics.

Appellant Michael Sarno occupied the top spot in the enterprise's hierarchy. He made high-level decisions about the gambling operations and had some control over the jewelry thefts as well. Beneath Sarno was Polchan, who exercised a

lesser leadership role. Finally, appellant Anthony Volpendesto was one of the main perpetrators of the robberies.

The government indicted Sarno, Polchan, and Volpendesto for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act in violation of 18 U.S.C. § 1962(d). The government also indicted Sarno and Polchan for conducting an illegal gambling business in violation of 18 U.S.C. § 1955. Finally, Polchan was indicted on several more counts; pertinent here are use of an explosive device (the pipe bomb) and conspiracy to do the same, in violation of 18 U.S.C. § 844(i) and (n), and conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

The government indicted several other individuals for their involvement in the criminal enterprise, too. Two of them, Casey Szaflarski and Sam Volpendesto, went to trial alongside the appellants. Szaflarski owned Amusements Inc. and handled day-to-day operations on the gambling front. Sam Volpendesto, Anthony's father, served as a jack-of-all-trades, participating in many robberies and the bombing of C & S. (Where ambiguous, we will refer to father and son by their first and last names.) Another co-defendant, a Cicero police officer named Dino Vitalo, pled guilty before trial. Two other enterprise members not only pled guilty but also agreed to cooperate as government witnesses: Mark Hay, a central figure in the robberies, and James Formato, a Berwyn police officer. A final enterprise member, Kyle Knight, pled guilty in a separate federal charge and also agreed to cooperate. Knight collaborated with Hay on many robberies, and he also supplied the enterprise with the materials for the pipe bomb.

The main building blocks of the government's case against the appellants are discussed below.

## A.  Illegal gambling activity and use of an explosive device

Several business owners testified that Amusements Inc. supplied them with video gambling machines and that Casey Szaflarski would visit every week or two to divide the profits. (Government agents photographed Szaflarski making rounds to the establishments.) Agents also observed Polchan organizing the gambling activity, including taking delivery of machines at Goldberg Jewelers. However, Sarno exercised ultimate control, as revealed by witness testimony and wiretaps of Sarno's multiple phones. In one revealing recording, Polchan told Sarno about an opportunity to place the devices in the clubhouses of the Outlaws Motorcycle Club in Chicago's south and west suburbs. Sarno counseled Polchan, "We put 'em, put 'em in every place, whatever comes out you know, the good will absorb the bad." The next day, the government observed gambling devices being unloaded at Goldberg Jewelers and then delivered to an Outlaws Motorcycle Clubhouse in Kankakee.

Testimony from Hay and others confirmed that Sarno exercised a significant degree of control over the gambling activity. For example, Hay testified that when he inquired about obtaining machines for his brother-in-law, Polchan said that he would need to call "my guy"—who Hay understood to be Sarno—to get approval. Another witness, Henry Rendon, likewise testified that when he tried to obtain video gambling devices from an enterprise member, he was told that "the big guy" (another nickname for Sarno) first had to agree.

To protect the enterprise's revenue, Sarno ordered the bombing of a rival video gambling business, C & S Amusements. The owner of C & S, Vincent Dublino, testified that he began to supply video devices to the 47th Street Grill in Lyons—a business previously serviced by Amusements Inc.—in the summer of 2002. A few weeks after C & S began supplying the machines, Sarno approached Dublino at Dublino's restaurant and angrily told him to "stay the fuck away from the 47th Street Grill stop." Later, Dublino began to receive threatening phone calls. In February 2003, a pipe bomb exploded outside C & S in the middle of the night. Reluctant to draw attention to his own illegitimate business, Dublino initially told the police that he thought the explosion was directed at his neighbor. But at trial he avowed that Sarno was behind it.

Kyle Knight confirmed this account. In 2002, Knight and Sam Volpendesto had a conversation about explosive devices. After their talk, Hay called Knight and told him that Sam Volpendesto wanted Knight to build a bomb. Knight gave the raw materials (potassium perchlorate and aluminum powder) and instructions on how to combine them to Hay for Hay to give to Volpendesto. After the bomb went off outside C & S, Volpendesto approached Knight and offered him $300, telling Knight, "your shit worked really good." Later, Volpendesto explained to Knight that "the big guy" was "having problems with poker machines, that somebody was putting machines where they shouldn't be and that he was looking for a way to send a message."

The day after the bombing, Berwyn police officer and enterprise member James Formato told Hay to let Polchan know that the police were looking for a brown van in con-

nection with the crime. Hay told the jury that when he passed along the message, Polchan asked him if the police had a license plate, and then added, "It shows you how smart they are, I wasn't even in the van." Formato testified that he also relayed the intelligence about the van to Polchan when he ran into Polchan at a car wash a few days later. Again, Polchan seemed unconcerned, telling Formato, "A lot of people drive brown vans."

A few years after the bombing, the government asked Hay to wear a wire and engage Sam Volpendesto in conversation about C & S Amusements. During their talk, Volpendesto described the details of the bombing and complained that Polchan had been paid for the job but that he had not. Volpendesto also told Hay that "Mark [Polchan] was the original guy that knew what the fuck it was about."

In 2007, the government arrested Kyle Knight and charged him for his participation in the bombing. After Knight's arrest, agents observed Sarno entering Goldberg Jewelers and conferring with Polchan about some documents. Later, agents retrieved shredded documents from the store's back room. The government determined the documents to be news articles about Knight's arrest and the docket sheet and information in Knight's case.

## B. Jewelry store robberies

Alongside the gambling activities, the enterprise made money from a slew of armed robberies targeting jewelry stores. Hay, Knight, and Formato, who all participated in many of these crimes, testified that Polchan selected certain targets, participated in some of the robberies, and paid other enterprise members for stolen goods (often re-sold through

Nos. 11-3022, 12-1180 & 12-1656                    7

his store, Goldberg Jewelers). In addition to jewelry rob-
beries, Polchan purchased boosted goods—cigarettes, elec-
tronics, and so forth—and sold them at Goldberg for below-
market prices.

Hay and Knight also implicated both Volpendestos in the
robberies. In particular, they told the jury that Anthony Vol-
pendesto took part in at least nine separate thefts: stealing
cars to use as getaway vehicles, aiding in the robberies
themselves, transporting goods, and so on.

The thefts tapered off after a botched robbery of Marry
Me Jewelry Store in August 2003. Anthony Volpendesto had
learned from Marry Me's owner that a salesman would be
carrying a briefcase full of valuable jewels—roughly
$650,000 worth—from the store at a particular time, and he
suggested to Knight and Hay that they rob him. Anthony
Volpendesto and Knight entered the store together to inter-
cept the jewels, but the salesman unexpectedly resisted. Dur-
ing the struggle, Knight's pistol discharged and shot the
salesman in the chest. The group fled with the loot and
drove to Polchan's house. Polchan agreed to hold on to the
jewels, but said that he would be unable to move the goods
until things calmed down. He also told Hay, Knight, and
Anthony Volpendesto to stay away from Goldberg Jewelers
until he contacted them. Polchan never paid the men any
proceeds from the Marry Me heist.

Sarno's connection to the robberies was less overt than
his connection to the gambling, but the government present-
ed several pieces of circumstantial evidence suggesting that
Sarno exercised control from behind the scenes. For exam-
ple, Hay said that he and Knight consulted with Polchan to
decide whether to rob a dice game. Polchan told them to

"stay away from the dice game," because "his guy" said
"not to get anywhere near it." Hay testified that he under-
stood "his guy" to be a reference to Sarno.

In a similar vein, Hay told the jury about a time that he
discovered his son in the possession of stolen basketball
cards. Hay's son told Hay that Sam Volpendesto had given
him a ride to the store and instructed him to steal the cards.
When Hay told Polchan what had happened, Polchan be-
came furious, saying that "his guy" would hold Polchan re-
sponsible if Sam Volpendesto got arrested for stealing bas-
ketball cards. Finally, Hay also told the jury that Polchan
had once asked Sarno to settle a simmering dispute between
Polchan and a robbery victim, Lenny DeGrado. Apparently,
DeGrado blamed Polchan for the offense. Polchan told Hay
that he had asked "his guy" to talk to DeGrado and that Sar-
no had taken care of the problem.

The government also recorded a call placed to Sarno re-
garding a home burglary, in which the caller stated that his
house had been robbed. The caller asked Sarno to check
"your shops that these kids are bringing laptops to." Sarno
hung up and called Polchan at Goldberg Jewelers to ask if
the items had shown up. When Polchan said they hadn't,
Sarno replied, "I wish they did."

Other evidence indicated that Sarno exercised leadership
over Polchan generally. Polchan introduced Sarno to both
Knight and Hay as his "boss," telling them to shake Sarno's
hand but not to engage him in conversation. Sarno would
frequently visit Goldberg Jewelers and speak to Polchan pri-
vately. During these visits, Polchan would sometimes pro-
vide Sarno with merchandise, cash, or both.

### C. Conspiracy to obstruct justice

In 2003, a federal grand jury began investigating the C & S bombing. The investigation was still open in 2007.

From March to May of that year, the government used a microphone hidden in Goldberg Jewelers to record Polchan meeting with Dino Vitalo, a co-defendant and Cicero police officer, and other local police officers. Polchan had noticed suspicious vehicles outside Goldberg. The conversation revealed that Polchan had asked the officers to run the vehicles' licenses plates to determine if they were part of a federal investigation. The officers had obliged, and they told Polchan what they found out (which was largely inconclusive). One of the officers also used his access to Cicero police systems to run a deconfliction check that would determine whether the vehicles were surveilling Goldberg or another business down the street. Later, an officer told Polchan that individuals identifying themselves as "organized crime" were observed in one of the suspicious cars.

Polchan did not keep this information to himself. In one recording, Polchan told Sarno that his officers said "they got a case, that they were government, they work for the government. FBI or something." In another recording, Polchan can be heard agreeing with Reyes Silva—a frequent customer of Polchan's shop who dealt in stolen goods—that law enforcement could be watching Silva. Polchan also warned Silva that he might be served with a subpoena.

*     *     *

After a six-week trial, the jury returned guilty verdicts on

all counts. Polchan, Sarno, and Anthony Volpendesto now appeal.[1]

## II. Discussion

The appellants raise many issues. We start with the district court's pretrial order disqualifying Polchan's counsel of choice. We then consider Polchan, Sarno, and Volpendesto's challenges to their convictions and their claims of error at trial. All three appellants challenge the sufficiency of the evidence on the RICO conspiracy count, and Polchan challenges his conviction for conspiracy to obstruct justice; Polchan and Sarno object to a number of evidentiary rulings; and all three appellants challenge the jury instructions. Finally, having disposed of those trial-related issues, we turn to Sarno's and Polchan's challenges to their sentences.

## A. Disqualification of counsel

Prior to trial, the government moved to disqualify Polchan's attorney, Alex Salerno. The government was concerned that Salerno had previously represented three of Polchan's co-defendants. First, Salerno represented Mark Hay on state burglary charges. Some of these charges arose from

---

[1] Szaflarski chose not to appeal his conviction. Sam Volpendesto did appeal, and his case was originally consolidated with this one, but he died shortly after the appellants submitted their opening brief. Accordingly, we dismissed his appeal with instructions to dismiss the indictment. *See United States v. Moehlenkamp*, 557 F.2d 126, 128 (7th Cir. 1977) ("[T]he death of an appellant during the pendency of his appeal of right from a criminal conviction abates the entire course of the proceedings brought against him."). There remains a question about what happens to the restitution order the district court assessed against Volpendesto under 18 U.S.C. § 3663A, which we will address in a separate opinion (No. 11-3020).

Nos. 11-3022, 12-1180 & 12-1656                                    11

enterprise burglaries in which Polchan himself was involved. Second, Salerno represented Sam Volpendesto at his arraignment, although he withdrew as Volpendesto's counsel shortly thereafter. Finally, Salerno had some sort of relationship with Sarno. Its precise scope was not clear—the district court found Salerno "less than forthcoming" on the matter—but two incidents were revealing. In 2004, Sarno had identified Salerno as his attorney, and Salerno had once shown up to monitor federal agents while they conducted a search of Sarno's house.

Polchan, Sam Volpendesto, and Sarno—but not Hay—waived any conflicts that might arise from Salerno's previous representation of them. Polchan also retained another attorney, Damon Cheronis, to serve as Salerno's co-counsel; Cheronis represented that he would cross-examine Hay at trial and that Salerno would not share any privileged information with him. And Polchan filed an affidavit from a third lawyer stating that the lawyer had consulted with Polchan about the benefits of cooperating with the government.

Nevertheless, the district court granted the government's motion to disqualify Salerno. The court first found it significant that Salerno had previously represented Hay in state court for criminal conduct that would be encompassed within the federal indictment, pointing out that it "cannot know what information Salerno has learned from his previous client [Hay] that would be detrimental to that client in this case" and that "[c]ross-examination by an independent counsel would not safeguard against … impermissible use of confidential information." The court further observed that Hay refused to consent to Salerno's representing Polchan.

Salerno's relationship to Sam and Sarno further deepened the court's concern.

Summing up, the court explained that "the potential and actual conflicts are so numerous and multi-faceted … that they cannot be adequately safeguarded against by admonitions from the Court or the intervention of independent counsel to perform discrete functions during the trial." The court disqualified Salerno.

Polchan argues that the district court erred in making this determination. We disagree. The district court's decision to disqualify Salerno was reasonable in light of Salerno's prior representation of multiple co-defendants, including a co-defendant that had already agreed to testify on behalf of the government.

"It is well-settled … that a criminal defendant's right to his chosen attorney may be outweighed by a serious potential for conflict due to the attorney's prior representation of other defendants charged in the same criminal conspiracy." *United States v. Algee*, 309 F.3d 1011, 1013 (7th Cir. 2002). In *Algee*, the government moved to disqualify a lawyer who had previously represented two co-defendants, both of whom the government was likely to call as principal witnesses. The district court in *Algee* observed that "ethical constraints would prohibit [the lawyer] from cross-examining [his former clients] in any meaningful way" and granted the government's motion. *Id.* at 1014. We found no abuse of discretion.

Polchan argues that Salerno's disqualification cannot be squared with *United States v. Turner*, 594 F.3d 946 (7th Cir. 2010), where we said that the "mere *possibility*" that jointly

Nos. 11-3022, 12-1180 & 12-1656                    13

represented defendants "would decide to cooperate with the government against the other" was not enough to disqualify a defendant's counsel of choice. *Id.* at 953. But the district court was not dealing with a mere possibility. Hay had already decided to cooperate with the government and testify against his co-defendants when the government moved to disqualify Salerno. And Salerno had represented Hay on closely related state charges, including charges that involved Polchan, where he might have obtained damaging evidence about Hay's credibility or his guilt. What is more, *Turner* recognized that "a breach of the code of professional ethics obviously qualifies" as an actual conflict. *Id.* at 952. Here, Salerno could not represent Polchan—over Hay's objection—without violating his ethical obligations to his former client. Under the Illinois Rules of Professional Conduct, Hay's refusal prohibited Salerno from taking on Polchan as a client. *See* Ill. R. Prof'l Conduct 1.9(a), 1.6(a) (2010).

In short, this case involved an actual conflict, not a potential one. And we said in *Turner* that where the court "finds an actual conflict of interest that seriously undermines counsel's effectiveness, 'there can be no doubt that [the court] may decline a proffer of waiver.'" 594 F.3d at 952 (quoting *Wheat v. United States*, 486 U.S. 153, 162 (1988)). We affirm the district court's decision to disqualify Salerno.

## B. Trial issues

### 1. Sufficiency of the evidence

The appellants raise two different sufficiency challenges. Polchan, Sarno, and Anthony Volpendesto challenge their convictions for racketeering conspiracy, and Polchan challenges his conviction for obstruction of justice. As usual, we

review the evidence presented at trial in the light most fa-
vorable to the government and ask whether any reasonable
juror could have found the defendants guilty of the charged
crime beyond a reasonable doubt. *United States v. Useni*, 516
F.3d 634, 646 (7th Cir. 2008).

### a. RICO conspiracy

The Racketeer Influenced and Corrupt Organizations Act
makes it illegal for "any person employed by or associated
with any enterprise … to conduct or participate, directly or
indirectly, in the conduct of such enterprise's affairs through
a pattern of racketeering activity." 18 U.S.C. § 1962(c). An en-
terprise includes "any union or group of individuals associ-
ated in fact," which is to say, "associated together for a
common purpose of engaging in a course of conduct." *Boyle
v. United States*, 556 U.S. 938, 944 (2009) (quoting *United
States v. Turkette*, 452 U.S. 576, 583 (1981)).

The RICO statute also prohibits conspiracy to commit a
violation of its provisions. *See* 18 U.S.C. § 1962(d). To prove
conspiracy under § 1962(d), the government must show that
the conspirators were "aware of the essential nature and
scope of the enterprise and intended to participate in it."
*Useni*, 516 F.3d at 646. In *United States v. Neapolitan*, 791 F.2d
489 (7th Cir. 1986), we said that a RICO conspiracy "can be
analyzed as composed of two agreements": (1) "an agree-
ment to conduct or participate in the affairs of an enter-
prise," and (2) "an agreement to the commission of at least
two predicate acts." *Id.* at 499. The government does not
have to prove that a conspirator agreed to commit the predi-
cate crimes personally, only that "a particular defendant
agreed that a *member* of the conspiracy would commit two

predicate racketeering acts." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011).

Polchan, Sarno, and Anthony Volpendesto appear to admit that there is evidence that they conspired to commit at least two predicate crimes. However, they argue that the government failed to show that they agreed to do so as part of an ongoing criminal enterprise. They urge that the government's evidence "is equally consistent with various defendants independently agreeing to commit various specific criminal acts as it is with the defendants agreeing to participate in the acts of an ongoing criminal enterprise." In other words, they say, all the government showed was that they engaged in "accidentally parallel action."

We find this contention highly implausible. The government does not need to put forth direct evidence of the defendants' agreement to participate in an ongoing criminal enterprise. As with conspiracy in general, circumstantial evidence that the defendants agreed to participate in the enterprise is sufficient. *See Useni*, 516 F.3d at 646. Here the evidence showed that Sarno, Polchan, and Volpendesto were part of a group with a cohesive, hierarchical structure that persisted over a long period of time. Polchan directed and Volpendesto participated in about a dozen robberies; Polchan also helped operate the ongoing illegal gambling business. In turn, Polchan consistently answered to Sarno, who exercised ultimate control over both activities. Based on this evidence, it is no great leap to conclude that each of the men agreed not just to commit isolated acts but also "to associate together for a common purpose"—to make money for the enterprise. *Boyle*, 556 U.S. at 938.

The appellants' individual arguments for insufficiency fare no better. Polchan claims that he was not present for the majority of the robberies and burglaries. But we have never suggested that a defendant is guilty of racketeering conspiracy only if he participates in every aspect of the enterprise's affairs. To the contrary, "[s]ection 1962(d) [is] broad enough to encompass those persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes." *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (citing *Neapolitan*, 791 F.2d at 498). Here, Polchan was intimately involved. He participated in some robberies personally, purchased and resold the stolen goods from many others, played a significant role in the gambling business, and participated in the pipe bombing of C & S.

Sarno argues that the jury heard no evidence tying him to any enterprise activity except the gambling. Not so: testimony from Dublino and Knight and the recorded conversation between Hay and Sam Volpendesto directly implicated Sarno in the C & S bombing. And Hay's testimony showed that Sarno knew about—and exercised a degree of control over—the robberies, as well. Recall that Sarno, via Polchan, forbade Hay and Knight from robbing a dice game; that Sarno called Polchan to try to track down a friend's stolen laptop; and that Polchan brought in "his guy" (Sarno) to mollify a jewelry store owner who had been the victim of an enterprise robbery.[2]

---

[2] Sarno claims that much of Hay's testimony about Sarno was based on pure speculation. Polchan never specifically stated who "his guy" was, Sarno contends, so Hay had no basis for concluding that Polchan was talking about Sarno. But Hay was a member of the enterprise and knew

Nos. 11-3022, 12-1180 & 12-1656                    17

It is hardly unexpected that members of a large criminal enterprise will have varying degrees of participation in its activities, because a racketeering enterprise is often characterized by a differentiated structure. *See United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) ("The continuity of an informal enterprise and the differentiation among roles can provide the requisite 'structure' to prove the element of 'enterprise.'"). An individual need not agree to perform each individual activity to violate RICO. In the Fifth Circuit's words, "[t]he gravamen of the [RICO] conspiracy charge … is not that each defendant agreed to commit arson, to steal goods from interstate commerce, to obstruct justice, or to sell narcotics; rather, it is that each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing"—or by agreeing that a member will commit—"two or more predicate crimes." *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978). Here, Sarno clearly agreed to participate in the enterprise's affairs, and he directed both the gambling and, at least to some extent, the robbery activities. That is enough for the jury to find him guilty of violating section 1962(d). *Cf. Salinas v. United States*, 522 U.S. 52, 65 (1997) ("It suffices that [a conspirator] adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for a crime's completion.").

Whereas Sarno argues that he only participated in the gambling, Anthony Volpendesto argues that he only participated in the robberies. Furthermore, he claims that he com-

---

the relevant players. Indeed, Hay testified that Polchan first introduced Sarno to Hay as "my guy." Hay's testimony was direct evidence about the enterprise that the jury was entitled to credit if it found Hay credible.

mitted most of his illegal activity only with Hay and Knight, that he had no contact with Sarno, and that he received no proceeds from the majority of the enterprise's crimes. But again, the government did not need to show that Anthony Volpendesto participated in every one of the enterprise's activities, only that he was "aware of the essential nature and scope of the enterprise and intended to participate in it." *Useni*, 516 F.3d at 646; *see also United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000) ("To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy."). In this case, the charged enterprise was formed in order to generate illegal income for its members. The jewelry robberies made up a significant portion of that income. Volpendesto took part in nine enterprise robberies, sometimes selecting targets and bringing them to other members himself (as with the Marry Me Jewelers robbery that went sour). Indeed, after he was arrested, Volpendesto passed messages to the enterprise via his father warning the other members that Hay was possibly cooperating with the government. We think a jury could conclude from these facts that Volpendesto was aware of the essential aspects of the enterprise and agreed to participate in it.

### b.  Conspiracy to obstruct justice

Polchan also challenges his conviction for conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k). Polchan and Cicero police officer Dino Vitalo were charged with agreeing to violate 18 U.S.C. § 1512(c)(2), which penalizes one who "corruptly"—that is, with a wrongful purpose— "obstructs, influences, or impedes any official proceeding or

attempts to do so."[3] This "expansive" subsection "operates as a catch-all to cover 'otherwise' obstructive behavior" that might not constitute a more specific offense like document destruction, which is listed in (c)(1). *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

There is a key limitation to § 1512(c)(2): one must obstruct (or agree to obstruct) "an official proceeding." A federal grand jury investigation counts. *See* 18 U.S.C. § 1515(a)(1)(A). And a grand jury was investigating the C & S bombing during the charged period, March to May 2007. During this time, Polchan noticed suspicious vehicles outside Goldberg Jewelers. Recordings from Polchan's store reveal that he asked corrupt local police officers, including Vitalo, to run the vehicles' license plates and perform a de-confliction check to discover whether the surveillance was for Goldberg or another business down the street. The officers did Polchan's bidding, and after they told Polchan what they had found, another recording caught Polchan disseminating some of that information to Sarno ("Yeah, they said they were fuckin', um, they got a case, that they were government, that they work for the government"). In another recording, Polchan can be heard agreeing with his associate Reyes Silva, who thought that he (Silva) might be being fol-

---

[3] As proof that Polchan took his actions corruptly, the government offered a stipulation that Vitalo's assistance was in contravention of Cicero Police Department orders forbidding officers from confirming the existence of any investigation to an unauthorized individual, communicating information to suspects that might enable them to conceal evidence, making unauthorized inquiries into other law enforcement investigations, or giving out motor vehicle information. On appeal, Polchan does not appear to contest the government's showing on this element.

lowed, that "they are going to keep continuing." Polchan also warned Silva that he should expect a subpoena.

Polchan now asserts that the evidence at his trial was insufficient to establish that he violated § 1512(k). He admits that he sought to learn about the federal investigation, and that he discussed the investigation with the police officers and with his cohorts. But there was no evidence, he maintains, that he agreed to take the further step of interfering with the evidence that would be presented to the grand jury.

The government's case against Polchan on this count was not airtight. But as with a racketeering conspiracy, *see Useni*, 516 F.3d at 646, an unlawful agreement to obstruct justice often must be inferred from the circumstances. And taken in the light most favorable to the government—as we must do at this stage—there was enough circumstantial evidence for a jury to conclude beyond a reasonable doubt that Polchan's efforts were not merely in service of his curiosity, but out of desire to influence what evidence came before the grand jury. Polchan had testified before a grand jury in the past, and he knew that information collected during the investigation would, in turn, be presented to the grand jury itself. He had enlisted a cadre of corrupt cops to feed him information that he had no right to have. And he showed a willingness to pass this wrongfully obtained information along to his associates. Although it is a close case, it was fair for the jury to infer that Polchan agreed to impede the grand jury's investigation.

## 2. Evidentiary rulings

We now address a series of objections to the district court's evidentiary rulings at trial. Unless otherwise noted,

we review the district court's decision to admit or exclude evidence for abuse of discretion only. *United States v. Spiller*, 261 F.3d 683, 689 (7th Cir. 2001).

### a. Admission of Sam Volpendesto's recorded statements

Polchan first argues that incriminating out-of-court statements made by Sam Volpendesto should not have been introduced at trial as substantive evidence of Polchan's guilt on the bombing counts. The statements at issue (which we discussed briefly above) are from a May 17, 2005 recording made by government informant Mark Hay while he was driving Sam Volpendesto around town. Hay purposefully engaged Volpendesto in conversation about the bombing at C & S Amusements, which had happened about two years earlier. Volpendesto obliged. Their conversation revealed many details about how Volpendesto and Polchan had carried out the job. Volpendesto and Hay also discussed how, right after the bombing, James Formato had told Hay to pass a message along to Polchan to warn him that law enforcement thought a brown van was involved in the crime.

Polchan objected to the government introducing the recorded conversation as substantive evidence of his guilt. In particular, he took issue with the following statements that tended to incriminate him:

- Sam Volpendesto's comment, as Hay drove past C & S Amusements, that "we blew part of that away" and that it was a "nice job."
- Volpendesto's identifying Polchan as the person who involved him in the job: "Mark

was the original guy that knew what the fuck it was about, you know what I mean?"

- Volpendesto's expression of frustration that Polchan (often referred to as "Goldberg," as in the name of his store) was compensated more generously for his services: "Goldberg made money [from the bombing], I made shit."

- Volpendesto's statement, in response to Hay's recollection that Formato had said police were looking for a brown van: "Yeah, a brown van … That's not what we had." When Hay mentioned that maybe the police were right that a van was used, Sam said, "But it wasn't us. No we didn't have a van. That's why we laughed the next day when we found out that they were saying it was a van."

- Volpendesto's statement, after Hay mentioned that he had passed the message about the brown van along to Polchan: "Yeah, he told me."

The district court admitted all of those statements under the statement-against-interest exception to the hearsay rule. *See* Fed. R. Evid. 802, 804(b)(3).

We agree with the district court that the portions described above fit comfortably within the exception. For Rule 804(b)(3) to apply, the proponent of an inculpatory hearsay statement must show: (1) that the declarant is unavailable to testify at trial; (2) that the statement was against the declarant's penal interest when made; and (3) that corroborating

circumstances clearly suggest that the statement is trustworthy. *United States v. Loggins*, 486 F.3d 977, 981 (7th Cir. 2007). At trial, Volpendesto invoked his right against self-incrimination; there is no dispute that, with respect to the first requirement, he was unavailable to testify.

With respect to the second requirement, a statement is sufficiently inculpatory "if it would be probative at trial against the declarant." *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). We have said that "statements that demonstrate a declarant's inside knowledge of a crime" count. *United States v. York*, 933 F.2d 1343, 1360 (7th Cir. 1991), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999) (en banc); *see also United States v. Shukri*, 207 F.3d 412, 416 (7th Cir. 2000) (statements that display the declarant's "intimate knowledge" of a crime are against the declarant's penal interest). All of the challenged portions of the recording—Sam Volpendesto's revealing that Polchan got him involved in the bombing, his frustration that Polchan made more money from the job than he did, and his discussion of the government's false lead with the brown van—demonstrated Volpendesto's inside knowledge of the crime and its surrounding events.

As for the third requirement—the trustworthiness of the statements—the district court found that Volpendesto's account was corroborated by the in-court testimony of Hay and Knight (who provided Volpendesto with the bomb-making material), and that everything Volpendesto described about the bomb itself was consistent with the forensic evidence at the scene. We have said that "[t]he district judge's determination as to the trustworthiness of an out-of-court statement is entitled to considerable deference and

should be upheld unless clearly erroneous." *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008) (internal quotation marks omitted). Especially because Volpendesto "thought he was speaking privately to a confederate," *United States v. Watson*, 525 F.3d 583, 588 (7th Cir. 2008), we see no reason to doubt the district court's assessment that his statements were reliable. Accordingly, we find that the court was within its discretion to admit the challenged statements under Rule 804(b)(3).

Nor is it an issue that Volpendesto's remarks were admitted as evidence against Polchan as well. The statement-against-interest exception to the hearsay rule is rooted in a theory about such statements' reliability. *See Watson*, 525 F.3d at 586 ("Most people would not say that they knocked over a bank, spit on a policeman, or shoved their mother if it wasn't true."). Once the hearsay is deemed sufficiently reliable to qualify for the exception, it may be used for any purpose, including as substantive evidence of a co-defendant's guilt. *See, e.g., id.* at 586–88 (evaluating a co-conspirator's hearsay statement under Rule 804(b)(3) to determine whether it was properly admitted against the appealing defendant); *United States v. Hamilton*, 19 F.3d 350, 354–57 (7th Cir. 1994) (rejecting an argument that admitting a co-defendant's hearsay statement against a non-declarant defendant under Rule 804(b)(3) constitutes a *Bruton* violation).

Polchan points out that the district court found that some of what Sam Volpendesto said in the May 17, 2005 recording was not against Volpendesto's penal interest. For example, when discussing Formato's tip about the brown van, Volpendesto mentioned that Polchan did in fact own a brown van and speculated that was why law enforcement had

thought one was involved. The district court found that this part of the conversation—and a few other threads that we need not go into—did not qualify for the Rule 804(b)(3) exception because these portions did not clearly incriminate Volpendesto. However, the government redacted the non-qualifying portions of the recording, and they were not played at trial. So we are not sure what Polchan is complaining of.[4] In sum, the redacted recording was properly admitted under Rule 804(b)(3).[5]

Polchan argues in the alternative that even if Volpendesto's incriminating statements were properly admitted under a hearsay exception, their admission nonetheless violated his rights under the Sixth Amendment Confrontation Clause because he could not cross-examine Volpendesto at trial.

Unlike evidentiary rulings, we review this constitutional claim de novo, *Watson*, 525 F.3d at 586, but here the standard of review does not much matter. The Confrontation Clause only concerns the admission of statements that are testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

---

[4] We notice that a single oblique reference to Polchan's owning a brown van seems to have stayed in even after the redactions. *See* Government Exhibit Hay 5/17/2005 Transcript, at 18 ("VOLPENDESTO: He had the brown van he had."). But any error as a result of this oversight was undoubtedly harmless; Formato later testified to the fact that Polchan owned a brown van.

[5] The district court alternatively admitted the incriminating statements against Polchan under the co-conspirator exception to the hearsay definition. *See* Fed. R. Evid. 801(d)(2)(E). Due to our conclusion that all of the statements implicating Polchan were properly introduced under the statement-against-interest exception, we need not explore this basis for their admission.

As such, Polchan's confrontation argument is foreclosed by our decision in *Watson*, which held that "[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." 525 F.3d at 589.

Polchan asks us to overrule *Watson*. He claims that the decision wrongly looked only to the speaker's perspective to determine whether a statement was testimonial. Polchan argues that we must also consider the subjective intentions of the listener—here, the government informant Hay—to determine whether a statement is made "with an eye toward trial." *Crawford*, 541 U.S. at 56 n.7. As he notes, the Supreme Court has said that "*both* the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Michigan v. Bryant*, 131 S. Ct. 1143, 1160 (2011) (emphasis added). But Polchan selectively quotes from *Bryant*. There, the Supreme Court instructed that "the relevant inquiry is *not* the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 1156 (emphasis added). Thus, contrary to Polchan's argument, *Bryant* mandates that we not evaluate the purpose of Hay and Sam Volpendesto's recorded conversation from the subjective point of view of Hay, who knew he was secretly collecting evidence for the government. Instead, we evaluate their conversation objectively. And from an objective perspective, Hay and Volpendesto's conversation looks like a casual, confidential discussion between co-conspirators. Because the statements in question were not testimonial, their admission did not implicate the Confrontation Clause.

Nos. 11-3022, 12-1180 & 12-1656                              27

### b. The supposed *Bruton* violation

Polchan argues that the government committed a *Bruton* error at trial that prejudiced his defense on the bombing-related counts. We conclude that no *Bruton* error occurred.

If a co-defendant makes an out-of-court confession that inculpates the defendant, and the co-defendant does not testify at their joint trial, the out-of-court statement cannot be introduced as evidence at all; the risk of prejudice to the non-confessing defendant is simply too great, even with a limiting instruction. *Bruton v. United States*, 391 U.S. 123 (1968). We review the district court's application of *Bruton* de novo. *United States v. Green*, 648 F.3d 569, 574 (7th Cir. 2011).

At trial, the government was examining its own witness, ATF Agent Tina Sherrow, about Sherrow's interview of Sam Volpendesto on August 23, 2006. Sherrow first described how she and another agent began the interview, and then described how she confronted Sam Volpendesto with the evidence implicating him in the February 2003 bombing of C & S. Then the following exchange occurred:

> GOVERNMENT: What, if anything, did Mr. Sam Volpendesto say in response?
>
> SHERROW: One of the things he said was that he had been asked to get a business license for a pawn shop. And then when it wasn't making any money, he had walked away from it—or when he wasn't getting paid—sorry—that he walked away from it. He indicated that.
>
> GOVERNMENT: Did he say anything else?

> SHERROW: He had mentioned that he had
> been at Goldberg Jewelers that day to—

At this point, Agent Sherrow was cut off by a *Bruton* objection from Damon Cheronis, Polchan's counsel.

Polchan argues that before she was interrupted, Agent Sherrow was about to testify that Sam Volpendesto told her that he had been at Goldberg Jewelers on the day of the bombing. However, the government represents that Sherrow was only going to testify that Volpendesto told her that he had been to Goldberg Jewelers on *the day of the interview*, that is, August 26, 2006. The government was prepared to have Agent Sherrow clarify the point—but after a lengthy sidebar, in which several defense attorneys raised multiple objections on various grounds, the district court decided it was simpler to just strike Sherrow's answer entirely and instruct the jury to disregard it.

Polchan maintains that, given the context of Agent Sherrow's cross-examination, the jury might have interpreted her answer as he does: that Sam Volpendesto admitted that he had been at Goldberg Jewelers on the day of the bombing. He says that this admission directly implicated Polchan in the C & S bombing—which would amount to a *Bruton* violation, and would mean, in turn, that the district court's instruction could not suffice to correct the error.

This is a stretch. Unlike *Bruton* and its progeny—*Richardson v. Marsh*, 481 U.S. 200 (1987) and *Gray v. Maryland*, 523 U.S. 185 (1998)—the statement relayed by Sherrow did not amount to a "confession" by Volpendesto that he committed the bombing. If the jury interpreted the statement the way that Polchan does (a rather big "if"), all that Vol-

pendesto admitted to was having visited Polchan's store on the day in question. This is not "powerfully incriminating" either to Volpendesto or to his co-defendant. *Richardson*, 481 U.S. at 208. *Bruton* itself instructed that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions"; its special rule applies only when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." 391 U.S. at 136. The government did nothing of the sort here.

### c.  Limitation on Sarno's cross-examination of Dublino

Sarno also argues that the district court's decision to curtail his cross-examination of Dublino violated Sarno's Sixth Amendment rights. We review de novo whether the court's limitation offends the Confrontation Clause. *United States v. Reese*, 666 F.3d 1007, 1018 (7th Cir. 2012).

Sarno first complains that the court cut him off when he was trying to impeach Dublino's credibility. He refers to a portion of cross where his counsel asked Dublino whether he would describe his video gambling business as "lucrative," and then asked Dublino about "his Lamborghini." Counsel aggressively questioned Dublino about how many Lamborghinis he had, when he got them, and what color they were. Dublino refused to play, and insisted repeatedly that "the Lamborghini" was not his. After letting this go on for some time, the district court sustained the government's objection on relevance grounds. In a sidebar, the court told Sarno's counsel that if he wanted to ask Dublino how much money he made from his gambling-machine business and

whether Dublino underreported this illegal income on his taxes, that was fine, but not to waste more time on cars Dublino may or may not have had. The court also pointed out that Dublino had already admitted to underreporting his gambling-machine income. Sarno's counsel then theorized that Dublino's purchase of the Lamborghinis rose to the level of money laundering. The court responded that Dublino had already admitted that his behavior amounted to criminal conduct, and that Sarno's strategy of asking about fancy cars to get at the possibility of money laundering was too "far afield" for the court to let him continue.

Sarno contends that Dublino's credibility was crucial to the government's case, and that the court impermissibly limited Sarno's impeachment strategy at a critical juncture. We disagree. "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised." *United States v. Martin*, 287 F.3d 609, 620 (7th Cir. 2002). The ultimate point of the Lamborghini digression was that Dublino made illicit gains through his gambling-machine business. But Dublino had already admitted that he lied about his gambling business to the authorities and that he failed to report his illegal income on his taxes. Moreover, the court allowed Sarno and the other defendants to continue to interrogate Dublino about his tax underreporting. Thus, Sarno had adequate opportunity to elicit the damaging information—i.e., the fact that Dublino made money through an illegal business and lied about it—necessary for the jury to assess his credibility. Given that "trial courts have wide latitude" to limit a cross-examination strategy that amounts to "interrogation that is repetitive or only marginally relevant," *United States v. McGee*, 408 F.3d 966, 975 (7th

Cir. 2005), the court did not stymie Sarno's defense by cutting off a line of inquiry that promised a very limited payoff, at best.

Sarno's second contention is that the district court improperly prevented him from impeaching Dublino with an allegedly inconsistent statement that Dublino made to federal agents. This too requires some context. During direct, Dublino testified that Sarno approached him twice in the summer of 2002: once to ask if Dublino wanted to go into business together, and the second time to tell Dublino "to stay the fuck away from the 47th Street Grill stop." Dublino also testified that two other men, who he did not know, threatened him in person a few weeks after Sarno's second visit. After their visit, Dublino received several unidentified threatening phone calls; he testified that those calls occurred before the February 2003 bombing of C & S Amusements.

On cross, Sarno's counsel asked Dublino whether he had "received a number of telephone threats" before Sarno ever approached him. Dublino said no, he received the telephone threats later. Sarno's counsel then sought to impeach Dublino with the following out-of-court statement from a February 2006 FBI report, apparently written by the interviewing agent: "In addition to the visits with Mr. Sarno, Dublino also received several threatening phone calls on his cell phone prior to the bombing. Dublino recalled he received a call when he first opened C & S and the unidentified caller wanted to invest in the business." The district court sustained the government's objection, noting that the statement in the FBI report did not contradict Dublino's testimony.

True, Dublino's statement in the FBI report is not crystal clear. But it certainly can be read the way that the court read

it: that Dublino received the threatening phone calls he de-
scribed in the period after Sarno's visits but before the
bombing, but that Dublino also received a call from someone
asking to invest in the business shortly after he started C & S
Amusements. The court did not abuse its discretion in con-
cluding that the statement was consistent with Dublino's tes-
timony.

In any event, Sarno tells us that the reason the court's ex-
clusion of Dublino's statement was significant—that is, the
reason the exclusion supposedly rose to the level of a con-
frontation violation—is that Sarno wanted to establish an
alternate source of the threats Dublino claimed to have re-
ceived. But Sarno could not have used the evidence for that
purpose. While it would have been proper for Sarno to offer
the contradictory statement to show that Dublino was not
credible, Sarno could not offer the out-of-court, unsworn
statement to prove that Dublino did *in fact* receive threaten-
ing phone calls before Sarno's visits. If used for the latter
purpose, the statement would be hearsay. And Sarno cannot
establish a Sixth Amendment violation based on the district
court's denying him the opportunity to violate the rules of
evidence, at least under these circumstances. *See United
States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011). Accordingly,
we find Sarno's confrontation arguments without merit.

### d.  Witness testimony about fear of Sarno

Next, Sarno argues that the government elicited imper-
missible character evidence against him. However, the tes-
timony Sarno identifies was not propensity evidence within
the meaning of Federal Rule of Evidence 404(a)(1). Nor did
this testimony—or any other evidence offered in the gov-
ernment's case—violate the district court's pretrial ruling

prohibiting the government from linking Sarno to the Chicago Outfit or organized crime. We find that the district court was fully within its discretion in allowing this testimony to come in.

The first exchange Sarno complains of concerned government witness Henry Rendon. On direct, Rendon testified that he borrowed $15,000 from Sarno, to be repaid through the money generated by the video gambling machines that the enterprise had installed in Rendon's store. Rendon then decided to switch to Dublino's services—Dublino offered Rendon a bigger take—and he called one of Sarno's associates to tell him. The associate told Rendon that "the big guy" was going to be "pissed."

On cross-examination, defense counsel brought out the fact that Sarno himself never explicitly threatened Rendon. The district court, in keeping with its pretrial order that "witnesses could testify to their fear of Sarno without linking him to organized crime," allowed the government to elicit the following testimony on redirect:

> GOVERNMENT: And you were asked [on cross] whether or not Michael Sarno ever told you he was going to hurt you as a result of not paying back that loan. Do you recall that question?
>
> RENDON: Yes.
>
> GOVERNMENT: Did Michael Sarno have to threaten you face-to-face?
>
> RENDON: No.
>
> GOVERNMENT: Why not?

RENDON: Because of who he is.

A similar exchange occurred during Dublino's testimony about the time that Sarno told him to stay away from the 47th Street Grill. Dublino testified as to Sarno's demeanor during this confrontation and the fact that Dublino felt threatened by him. On cross, defense counsel brought out the fact that Sarno never touched Dublino during their encounter. In response, on redirect, the government brought up the defense's questions and asked, "Did he need to touch you?" Dublino answered no.

The third instance occurred during the government's direct examination of Hay. Hay testified that he was thinking about robbing a dice game, but that he consulted with Polchan first. Polchan told Hay to stay away from the dice game, because Polchan's "guy" said so. Hay testified that he obeyed: "I knew if I robbed that dice game my life would be in jeopardy."

Sarno argues that all of this was impermissible character evidence in that it tended to show that Sarno is a bad, scary guy. He claims that the admission of this testimony violated Federal Rule of Evidence 404(a)(1). Yet Rule 404(a)(1) only prohibits the introduction of evidence about a defendant's character when that evidence is offered "to prove that on a particular occasion the person acted in accordance with the character or trait." That is not what the government offered this testimony for. All three witnesses described Sarno's reputation in order to establish their own subjective state of mind—that is, to explain why the witness felt threatened by Sarno even in the absence of an explicit threat from Sarno himself. The government never elicited testimony that Sarno actually *was* a bad person, or violent, or a member of the ma-

fia. And the government certainly never argued that any of these qualities made it more likely that Sarno committed the crimes he was accused of. Thus, the district court properly admitted this testimony.

Further, this testimony did not run afoul of the district court's pretrial order forbidding references to the Chicago Outfit or to the mafia more generally. The district court was clear that if the defendants tried to insinuate that a witness was not justified in feeling threatened by Sarno, the court would allow the witness to try to explain why he legitimately felt fearful. This sensible approach to handling potentially prejudicial evidence was wholly within the district court's discretion. And true to its word, the government (and its witnesses) never mentioned the Chicago Outfit or organized crime at any point during the trial.

Sarno protests that the government subtly defied the court's order by "contaminating" the case with "numerous images and references to nefarious people." But all he can invoke in support of this assertion is the fact that various individuals came up in passing, or appeared in a photograph, who Sarno claims have an association with the Chicago Outfit. Sarno did not object to the majority of the references he now complains of. And in any event, he does not establish that it was likely the jury would have known who any of these individuals were. The district court, which was in a much better position to assess the prejudicial effect of these references, wholly rejected the claim that the government had injected the mafia into the case.[6] We see no reason to

---

[6] Responding to an objection by Sarno's attorney that "the government has brought in organized crime and the mob into this case," the court stated that "the record is exactly the opposite. The phrase hasn't been

come to a different conclusion, and we similarly reject Sarno's claim of error.

### 3.   Jury instructions

In our last trial-related issue, the appellants object to the district court's jury instructions on the RICO conspiracy count. We review the legal accuracy of a jury instruction de novo, and particular phrasing for an abuse of discretion. *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013). We recognize, however, that "[a] trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The challenged instruction, Instruction No. 30, came from the Federal Criminal Jury Instructions of the Seventh Circuit 322 (1999). It read:

> To be associated with an enterprise, a person must be involved with the enterprise in a way that is related to its affairs or common purpose[, although the person need not have a stake in the goals of the enterprise and may even act in a way that subverts those goals]. A person may be associated with an enterprise without being so throughout its existence.

The bracketed language, which the government requested, is optional; it echoes our opinion in *United States v. Yonan*, 800 F.2d 164 (7th Cir. 1986), where we declared that "the defendant need not have a stake in the enterprise's 'goals,' but can

---

mentioned. It hasn't been used. There's been no direct reference to it. There's not even been an indirect reference to it."

associate with the enterprise by conducting business with it, even if in doing so the defendant is *subverting* the enterprise's goals." *Id.* at 167.

Anthony Volpendesto opposed the inclusion of the optional language. He argued that it was only appropriate where the indictment concerned a "lawful" enterprise—as in *Yonan*, where the defendant argued that he could not be "associated" with the Cook County State's Attorney's Office because he had committed crimes against it. The district court demurred, declining to rule on the objection immediately, but noting that the jury was "entitled to know that just because one of the enterprise members is sneaking some of the booty off for himself doesn't mean he can't be a member of the enterprise." On the first day of closing arguments, the court told the parties that it was still considering the language of the instruction. The following day, the court rejected Volpendesto's proposed alternative and settled on Instruction No. 30, including the bracketed language.[7]

---

[7] The appellants argue that the district court violated Federal Rule of Criminal Procedure 30, which requires the district court to inform the parties before closing arguments how the court intends to rule on requested instructions. *See* Fed. R. Crim. P. 30(b). However, no one asked for a final ruling when the court informed the parties that the proposed instructions were under consideration, and we see no plain error. The purpose of Rule 30(b) is "to allow counsel a meaningful opportunity to tailor their closing arguments to the court's pronouncement of the law governing the case." *United States v. Algee*, 599 F.3d 506, 515 (6th Cir. 2010). The appellants already knew that the court felt the jury should be informed that the defendants could be convicted even if they were ultimately acting in their own self-interest. And the appellants do not tell us how their argument would have been different if the court had ruled definitively ahead of time.

The appellants renew this argument on appeal, maintaining that the instruction made no sense in the context of an unlawful enterprise. However, RICO draws no distinction between "lawful" and "unlawful" enterprises, *see* 18 U.S.C. § 1961(4) (definition of "enterprise"), and we have never drawn such a distinction in our cases. Nor do we see a reason to do so here. It makes little sense to construe RICO so that it is *more* difficult for the statute to reach individuals who associate with illegal enterprises than legal ones. *Cf. United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991) ("It would be ironic if the RICO statute, aimed primarily at criminal enterprises such as the Mafia and its many petty imitators, was more effective against legal enterprises."). Yet that is precisely what Volpendesto's construction would do.

The appellants also suggest that the instruction was misleading because the indictment charged the defendants with participating in an "association-in-fact" enterprise, defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946. At trial, the appellants—Volpendesto in particular—argued that they could not have agreed to join the enterprise because they did not share a common purpose with the other members. By telling the jury that a defendant could still associate with an enterprise even if he did not have "a stake in the goals of the enterprise," the appellants maintain, In-

---

In three sentences, the appellants also argue that the district court violated their Sixth Amendment and due process rights by prohibiting any party from referring to the instructions during closing argument. We treat such a perfunctory argument as waived. *See United States v. Warner*, 498 F.3d 666, 702 (7th Cir. 2007).

struction No. 30 wrongly implied to the jury that arguments about a lack of a common purpose were irrelevant.

But the instructions suggested no such thing. The very first sentence of Instruction No. 30 stated, "To be associated with an enterprise a person must be involved with the enterprise in a way that is related to its affairs or common purpose." And the court separately instructed the jury that "[t]he term 'enterprise' can include a group of people associated together for a common purpose of engaging in a course of conduct." The appellants were thus completely free to argue that they never shared a common purpose with their confederates.

Nor is it contradictory to say that someone shares in a common purpose even though that person's ultimate interests diverge from his confederates. A person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means. He cannot escape liability just because, at the end of the day, he prizes his own self-interest above the group's. Instruction No. 30 adequately expressed this point, and it was not an abuse of discretion to give it.

Even if we were to find that Instruction No. 30 should not have been phrased as it was, we would reverse "only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *Dickerson*, 705 F.3d at 688. We do not believe that is the case here. As just discussed, other portions of the instructions clearly stated that an association-in-fact required a common purpose and that a defendant associated with an enterprise by involving himself in a way that related to that common purpose. Indeed, An-

thony Volpendesto's lawyer repeatedly emphasized this point during her closing argument. ("How can Tony be involved in the enterprise … that's supposed to include all these people, that's supposed to include all this activity, that's supposed to cover this timeframe, when he's not involved in it and he doesn't get what the common purpose is, he doesn't get any money from it.") Viewed in context, that the jury convicted Volpendesto anyway does not show that it was misled, merely that it did not believe his story.

## C. Sentencing

Finally, we address Sarno's and Polchan's challenges to their sentences. We review the district court's interpretation and application of the U.S. Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. White*, 737 F.3d 1121, 1139 (7th Cir. 2013). We review the sentences' substantive reasonableness for abuse of discretion. *Id.*

### 1. Sarno's sentence

Sarno makes three challenges to his sentence: that the district court erred in calculating his guidelines range; that the court failed to consider the 18 U.S.C. § 3553(a) factors, and that the sentence itself was substantively unreasonable. We consider each in turn.[8]

---

[8] In his reply brief, Sarno adds a new argument: that any facts that increased his advisory guidelines range beyond the statutory maximums for his offenses should have been found by a jury. He suggests that this is a natural extension of the Supreme Court's decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), in which the Court held that a fact which increases the statutory mandatory minimum sentence must be found by a jury. Sarno's extension of *Alleyne* is foreclosed by the opinion itself, which emphasized that its holding "does not mean that any fact that influences judicial discretion must be found by a jury. We have long rec-

### a.  The guidelines calculation

At sentencing, the district court concluded that Sarno's adjusted offense level was 42. The court further concluded that Sarno's criminal history category was VI. His recommended guidelines range was therefore 360 months to life.[9] *See* U.S.S.G. Ch. 5, Pt. A (sentencing table). Sarno argues that

---

ognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." *Id.* at 2163; *see also United States v. Hernandez*, 731 F.3d 666, 672 (7th Cir. 2013) (judicial determination of a fact that triggers a higher advisory guidelines range does not offend the Fifth or Sixth Amendments).

[9] Because we find that the district court properly calculated Sarno's offense level, we need not address Sarno's separate argument, based on *Peugh v. United States*, 133 S. Ct. 2072 (2013), that the court impermissibly applied the career offender rules from the 2010 guidelines when it should have applied the rules from the guidelines in effect during the offense of conviction. Sarno argues that under the pre-2007 guidelines (namely, the rule in U.S.S.G. § 4A1.2(a)(2) instructing that "[p]rior sentences imposed in related cases are to be treated as one sentence" for the purposes of the criminal history category), his criminal history category would have been III. The government responds that Sarno's two prior convictions would not have been considered "related" even under the version of the guidelines that Sarno uses. *See* U.S.S.G. § 4A1.2(a)(2) (1995), cmt. n. 3. But even if the government were wrong and Sarno right, any error was harmless. That is because an offense level of 42 results in a recommended range of 360 months to life regardless of the offender's criminal history category—and no matter what guidelines are used. *See* U.S.S.G. Ch. 5, Pt. A (2011) (the guidelines in effect at the time of Sarno's February 2012 sentencing); U.S.S.G. Ch. 5, Pt. A (2010) (the guidelines used in the presentence investigation report calculations); U.S.S.G. Ch. 5, Pt. A (1995) (the guidelines Sarno wants to apply). As we ultimately conclude that the district court properly calculated Sarno's offense level, his recommended guidelines range would have been the same either way.

the court erred in calculating his offense level in two respects.

Sarno's first argument is that the court should not have found Sarno accountable for the C & S bombing and the robbery activity. Under the guidelines, when a defendant is convicted of a "jointly undertaken criminal activity," the sentencing court should take into account as relevant conduct "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred" during, in preparation for, or to avoid detection of the offense of conviction. U.S.S.G. § 1B1.3(a)(1)(B). So to ascribe another enterprise member's relevant conduct to Sarno, the court had to determine that the member's act or omission was both (1) within the scope of the criminal activity that Sarno agreed to undertake, and (2) reasonably foreseeable to him. *See United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010).

The court found that Sarno ordered the C & S bombing. It also found that Sarno exercised control over the robberies, at least to the extent that he could put certain people or places off-limits. The court further noted that Sarno seemingly had the ability to confer a degree of protection on his underlings, Polchan in particular. More generally, the court explained that "after you look at all of the evidence in the aggregate … the testimony, the actions of the defendant in going in secrecy to see co-defendant Polchan when news media events … begin to show there's a leak in the organization … the reasonable inference is that he would only care about those things if he was involved in the organization." This evidence, the court concluded, gave a "convincing account

which has Mr. Sarno as a person who is in control of much of the action and certainly accountable for virtually all of it."

As to the bombing, Sarno claims that the court's conclusions were based on trial testimony that was incredible as a matter of law. For example, with respect to Sarno's role in the bombing, the court relied on Dublino's testimony that Sarno threatened him. Sarno argues that Dublino contradicted himself on the stand and had ample motive to fabricate evidence. But the district court observed Dublino's testimony firsthand and, with knowledge of these possible deficiencies, chose to credit it. That was not clear error.

As to the robberies, Sarno argues that there was no evidence showing his responsibility. But as discussed above, Sarno was connected to the robberies in multiple ways: Polchan felt the need to check with Sarno before robbing a dice game; Sarno called "his store," Goldberg, and spoke to Polchan hoping to locate some stolen property; Polchan was worried that Sarno would become angry if he knew that Sam Volpendesto was participating in petty thefts; and Sarno stepped in to "take care" of a jewelry store owner who was upset at Polchan for a prior robbery. This evidence showed not only that Sarno exercised a degree of control over the robberies, but also that the activity was reasonably foreseeable to him. Again, the court did not clearly err in concluding that these facts supported attributing the conduct to Sarno under § 1B1.3.

Sarno's second challenge to his offense level calculation relates to the four-level sentencing enhancement the district court imposed for Sarno's role as the "organizer or leader" of the criminal activity. *See* U.S.S.G. § 3B1.1(a). Sarno argues that the government's only evidence that he was a "lead-

er"—as opposed to a "manager or supervisor," which triggers a lesser enhancement—were his nicknames: "my guy," "big guy," and so forth. If that were true, Sarno would have a point. However, the district court did not just look at Sarno's nicknames. Rather, the court incorporated its extensive analysis with regard to the jointly undertaken criminal activity determination, and additionally noted the "words of approval" that Sarno uttered to Polchan when discussing the distribution of video gambling machines—words that "clearly indicat[ed] a supervisory position over what was taking place." The guidelines specify that the "exercise of decision making authority" and the "degree of control and authority exercised over others" are factors that a court should consider to distinguish a leadership role from a lesser supervisory one. U.S.S.G. § 3B1.1 cmt. n. 4. On these facts, the court's conclusion that Sarno filled a leadership role was not clearly erroneous.

### b.  Consideration of the § 3553(a) factors

Sarno next argues that the district court failed to give adequate consideration to the factors listed in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 51 (2007).

First, Sarno claims that the court ignored his particular "history and characteristics" in contravention of § 3553(a)(1). Specifically, he says that the court overlooked mitigating evidence of Sarno's good works in his community and his support from family and friends. However, the sentencing transcript belies Sarno's assertion that the court ignored this evidence. The court made a point of noting that "the hardship to the defendant's family, his children, the people around him, the Court has no doubt is real and is—the word unfortunate seems insufficient." The court simply chose to

Nos. 11-3022, 12-1180 & 12-1656                                    45

give this aspect of Sarno's background little weight in light
of the fact that he engaged in criminal activity shortly after
serving his previous sentences for similar offenses, his evi-
dent lack of respect for the law, the danger his crimes posed
to the community, and the need to provide deterrence to
whoever replaced Sarno in his criminal organization. Sarno
may take issue with how the district court weighed the good
against the bad, but that is not a claim of procedural error.
And in any event, "the sentencing judge was in a superior
position to balance these sentencing considerations, and we
will not second guess his determinations." *United States v.
Farris*, 532 F.3d 615, 620 (7th Cir. 2008) (citation omitted).

Sarno also contends that the court failed to give adequate
attention to his arguments that he posed a lesser risk of re-
cidivism based on his age and health, his family and com-
munity ties, and his remorse for his actions. The hearing
transcript does not bear out this assertion, either. Sarno's in-
vocation of remorse is puzzling, as aside from a vague
statement that he had "some deep regrets" but would "leave
the rest to [his] lawyers," Sarno exhibited nothing of the sort
at sentencing. Furthermore, the district court considered
Sarno's argument that he no longer posed a risk and wholly
rejected it. The court found that Sarno had engaged in "a
lifetime of crime," and determined that, based on Sarno's
criminal history and the evidence presented at trial, "the
likelihood that the defendant will continue to engage in this
dangerous conduct appears … to be very great." Thus, Sarno
has failed to establish procedural error on this basis.

### c.  Reasonableness of Sarno's de facto life sentence

Finally, Sarno argues that his sentence was substantively
unreasonable because it amounted to an effective life sen-

tence. Sarno was age fifty-four at sentencing, and he received twenty-five years' imprisonment. Though his release is technically within his life expectancy, *see* Social Security Administration, *Actuarial Life Table*, http://www.ssa.gov/OACT/STATS/table4c6.html (last visited Mar. 14, 2014), Sarno maintains that his poor health means that he will likely die in prison.

Although we have acknowledged the "worthy tradition that death in prison is not to be ordered lightly," and suggested that "the probability that a convict will not live out his sentence should certainly give pause to a sentencing court," *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006), we have never held that a sentencing court must check certain boxes in order to justify an effective life sentence. And we have previously found de facto life sentences reasonable where the district court determined, as the court did here, that the defendant's criminal history showed a risk of recidivism and lack of respect for the law. *See United States v. Kincannon*, 567 F.3d 893, 901 (7th Cir. 2009) (upholding a sentence of thirty years for a seventy-seven-year-old defendant where the district court noted that his "advanced age … had not deterred or slowed his criminal activity to date"); *Wurzinger*, 467 F.3d at 653 ("Wurzinger argues that older offenders are generally less likely to commit crime, but … what matters is whether the court reasonably concluded that Wurzinger in particular is a risk for further crimes."). In addition, the court expressed its conviction that "[i]t would be detrimental to the public interest for this Court or any other to leave the impression that one can engage in a lifetime of crime in the hope of avoiding capture and conviction until the very end and then retire to some sort of peaceful existence after having wreaked havoc and chaos among others."

Nos. 11-3022, 12-1180 & 12-1656                                    47

We find that Sarno's twenty-five-year sentence was within the court's discretion.

### 2. Polchan's sentence

Polchan was convicted of RICO conspiracy, conducting an illegal gambling business, conspiracy to commit arson, arson, use of a destructive device in relation to a crime of violence, conspiracy to obstruct justice, possession of stolen goods from interstate shipments, and various tax offenses. His resulting guidelines range was 360 months to life. The district court sentenced him to 720 months, or sixty years. He was age forty-four at sentencing.

Polchan makes no procedural challenges to the district court's guidelines calculation. Instead, he too challenges the substantive reasonableness of his de facto life sentence and argues that the district court did not sufficiently justify its choice.

We find that the court properly exercised its sentencing discretion in Polchan's case as well. The district court explained that it chose a sixty-year sentence because it wanted the length of imprisonment to "reflect[] the seriousness of [Polchan's] ongoing criminal offense and provide[] a punishment that is just for all that he has done." The judge emphasized how "organized criminal activity performed over a long period of time, deliberate and purposeful, poses a greater threat to the very fiber of our community." And the judge described his conviction that a serious sentence was necessary because "the public needs to be protected both from Mr. Polchan and from the idea that organized criminal activity might well be worth something, might well be worth doing." Through this explanation, the court adequately tied

its sixty-year sentence to the factors listed in 18 U.S.C. § 3553(a). We cannot say that its ultimate decision—which was within Polchan's guidelines range—was unreasonable.

Polchan also argues that the district court failed to consider the social and economic costs of a sixty-year sentence. Drawing on a concurring opinion in *United States v. Craig*, 703 F.3d 1001 (7th Cir. 2012) (per curiam), Polchan argues that the court should have explicitly weighed the expense of imprisonment to the government, which "rises steeply with the prisoner's age," against the "incremental deterrent effect of extremely long sentences" and the fact that in general, recidivism declines with age. *Id.* at 1003–04 (Posner, J., concurring) (emphasis omitted). But of course, Judge Posner was (in his own words) "merely suggesting" that a sentencing judge ought to undertake this form of societal cost-benefit analysis. *Id.* at 1004. We have never held that a district court must explicitly weigh these factors.

Accordingly, we affirm Polchan's sentence.

### III. Conclusion

The judgment of the district court is

AFFIRMED.